**SMITH KRIVOSHEY, PC**
Yeremey O. Krivoshey (State Bar No. 295032)
28 Geary Street, Suite 650 # 1507
San Francisco, CA 94108
Phone: 415-839-7000
E-Mail: yeremey@skclassactions.com

**SMITH KRIVOSHEY, PC**
Joel D. Smith (State Bar No. 244902)
867 Boylston Street, 5th Floor, Ste. 1520
Boston, MA 02116
Phone: 617-377-7404
E-Mail: joel@skclassactions.com

*Attorneys for Plaintiff*
[Additional counsel on signature page]

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

ANTHONY STRONG, individually and on behalf of all others similarly situated,

Plaintiff,

v.

WATKINS WELLNESS LLC and WATKINS MANUFACTURING CORP.

Defendants.

Case No. 3:26-cv-01896-BTM-SBC

**FIRST AMENDED CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

## INTRODUCTION

1. Watkins Wellness LLC and Watkins Manufacturing Corp. (collectively, "Defendants") manufacture, market, and sell a line of premium hot tubs known as the Highlife Collection spas (the "Products").[1] The Products contain Hydromassage Rotary Jets (6 fin) that Defendants touted as state-of-the-art features providing therapeutic benefits and relaxation. Despite marketing these Products as safe, premium wellness systems, the Products suffered a defect in materials, workmanship, and/or design—the hydromassage rotary jets create a dangerous suction force that allows users' hair to become entangled, submerging their heads underwater, and posing serious entanglement and drowning hazards (the "Defect").

2. Defendants failed to disclose the Defect to consumers in their labeling, packaging, or marketing materials, and instead continued to charge premium prices ranging from $16,000 to $24,000 for Products that lacked the safety consumers expected.

3. In response to mounting pressure, Defendants initiated an inadequate, nationwide recall on February 12, 2026 (the "Recall"),[2] affecting approximately 32,900 units sold nationwide between October 2022 and September 2025. The Recall covers eight models—Grandee, Envoy, Vanguard, Aria, Prodigy, Sovereign, Jetsetter, and Jetsetter LX—from model years 2023, 2024, and 2025.[3]

4. Plaintiff Anthony Strong brings this action individually and on behalf of a Nationwide Class and California Class, asserting claims for breach of express warranty, breach of implied warranty of merchantability, unjust enrichment, and

---

[1] The Products include all Highlife Collection spas with Hydromassage Rotary Jets (6 fin) manufactured in China and sold through independent pool and spa dealers nationwide, including but not limited to the Grandee, Envoy, Vanguard, Aria, Prodigy, Sovereign, Jetsetter, and Jetsetter LX models from model years 2023, 2024, and 2025.

[2] https://www.cpsc.gov/Recalls/2026/Watkins-Manufacturing-Recalls-Hydromassage-Rotary-Jets-in-Highlife-Collection-Spas-Due-to-Entanglement-and-Drowning-Hazards (last accessed March 6, 2026)

[3] *Id.*

violations of California's Unfair Competition Law, and Song-Beverly Consumer Warranty Act, to seek full compensation for all consumers harmed by Defendants' deceptive practices and dangerous Products.

5. Plaintiff alleges the following upon information and belief and investigation of counsel, except for those allegations pertaining to Plaintiff, which are based on personal knowledge.

## PARTIES

### I. Plaintiff Anthony Strong

6. At all relevant times, Plaintiff Anthony Strong has been domiciled in Los Osos, California.

7. On August 31, 2023, Plaintiff Strong purchased a Hot Spring Aria Spa, serial number ARN23D3231110, from Stove & Spa Center, located at 7485 El Camino Real, Atascadero, California 93422, for approximately $23,540.31. Stove & Spa Center is an authorized dealer of Defendants' products.

8. The spa was delivered and installed in Los Osos, California, several weeks following the purchase.

9. Plaintiff Strong retains possession of the spa.

10. Prior to his purchase, Plaintiff Strong read and relied on Defendants' advertising, marketing materials, labeling, and packaging, including representations that the spa was safe, of high quality, and suitable for its intended use, which he understood to mean the Product did not pose entanglement or drowning hazards to users.

11. Plaintiff Strong would not have purchased the Hot Spring Aria Spa on the same terms or for the same price had he known that it had a defect in materials, workmanship, and/or design; and that it was unsafe and unsuitable for its intended, marketed, and/or reasonably foreseeable use; and was dangerous, or exposed users to the risk of hair entanglement and drowning.

12. Plaintiff Strong requested replacement jets as part of the Recall. Plaintiff Strong did not bargain for a spa with defective jets and he certainly did not bargain for having to replace those defective jets himself. Plaintiff Strong would not have purchased the Hot Spring Aria Spa on the same terms or for the same price had he known that its jets were dangerously defective and the only way to address the Defect was for him to install replacement jets on the spa himself.

13. Plaintiff Strong has no past or present financial, employment, familial, or other relationship with any of the attorneys in this case.

## II. Defendants

### Watkins Wellness LLC

14. Defendant Watkins Wellness LLC is a limited liability company with its principal place of business located at 1280 Park Center Drive, Vista, California 92081.

15. At all relevant times, Watkins Wellness LLC has been engaged in the business of designing, manufacturing, testing, packaging, labeling, marketing, distributing, warranting, and selling the recalled Highlife Collection spas and related products, including hydromassage jets, spa accessories, and replacement parts, throughout the United States. Watkins Wellness LLC's nationwide business operations include the production and sale of premium spas, therapeutic jet systems, ozone purification systems, spa covers, and related wellness products sold under the Hot Spring, Highlife Collection, Moto-Massage, and other brand names.

### Watkins Manufacturing Corp.

16. Defendant Watkins Manufacturing Corp. is a corporation with its principal place of business located at 1280 Park Center Drive, Vista, California 92081.

17. At all relevant times, Watkins Manufacturing Corp. has been engaged in the business of designing, manufacturing, testing, packaging, labeling, marketing, distributing, warranting, and selling the recalled Highlife Collection spas and related

products, including hydromassage jets, spa accessories, and replacement parts, throughout the United States. Watkins Manufacturing Corp.'s nationwide business operations include the production and sale of premium spas, therapeutic jet systems, ozone purification systems, spa covers, and related wellness products sold under the Hot Spring, Highlife Collection, Moto-Massage, and other brand names.

18. On information and belief, there exists, and at all times herein existed, a unity of ownership between the two defendants and their agents such that any individuality or separateness between them has ceased and each of them is the alter ego of the other. Upon information and belief, at all times mentioned herein, each Defendant was acting as an agent and/or employee of the other Defendant, and at all times mentioned was acting within the course and scope of said agency and/or employment with the full knowledge, permission, and consent of the other Defendant. In addition, each of the acts and/or omissions of each Defendant alleged herein were made known to, and ratified by, the other Defendant. Accordingly, all allegations and claims asserted are equally applicable to both Defendants.

## JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d) of the Class Action Fairness Act of 2005 because: (1) there are 100 or more putative Class Members; (2) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs; and (3) there is diversity because at lease one class member and Defendants are citizens of different states. Specifically, there are hundreds, if not thousands, of putative Class Members who are citizens of states other than California, which is the place of citizenship for both Defendants.

20. Moreover, "[u]nder CAFA there is sufficient diversity to establish federal diversity jurisdiction so long as one class member has citizenship diverse from that of one defendant." *Broadway Grill, Inc. v. Visa Inc.*, 856 F.3d 1274, 1276 (9th Cir. 2017), *overruled on other grounds in Royal Canin USA, Inc. v.*

*Wullschleger*, 604 U.S. 22 (2025). CAFA diversity exists where "the class, on its face, include[s] many non-citizens of California." *Id.* That is the case here because the putative classes are not limited to Californians.

21. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

22. This Court has personal jurisdiction over Defendants because they are headquartered at 1280 Park Center Drive, Vista, California 92081, which is located within the Southern District of California, and because they do substantial business in this State and within this District, receive substantial compensation and profits from the marketing, distribution, and sale of the Products in this District, and have engaged in the unlawful practices described in this Complaint within this District.

23. All relevant and material decisions regarding the subject products occurred in California, including the labeling, marketing, and advertising of the products.

24. In accordance with 28 U.S.C. § 1391, venue is proper in this District because Defendants are headquartered in this District, Defendants regularly transact business in this District, and a substantial part of the conduct giving rise to Plaintiff's claims occurred in this District.

## COMMON FACTUAL ALLEGATIONS

### I. Defendants Sell The Highlife Collection Products.

25. Defendants manufacture, market, and sell a line of premium hot tubs known as the Highlife Collection spas under the Hot Spring® brand name.

26. The Highlife Collection consists of eight models: Grandee, Envoy, Vanguard, Aria, Prodigy, Sovereign, Jetsetter, and Jetsetter LX.[4]

[4] *See, e.g.*, https://www.hotspring.com/shop/highlife (last accessed March 6, 2026).

27. Each of these models was manufactured in China and sold through independent pool and spa dealers nationwide between October 2022 and September 2025.

28. The Products contain Hydromassage Rotary Jets (6 fin) that Defendants marketed as therapeutic features providing relaxation and wellness benefits.

29. The Products were sold in model years 2023, 2024, and 2025, with approximately 32,900 units sold in the United States.[5]

30. Complete Highlife Collection spas were priced between $16,000 and $24,000, positioning them in the premium segment of the consumer spa market.[6]

31. The Products were sold nationwide through independent retailers in all fifty states, as evidenced by Defendants' website allowing consumers to search for dealers by state:[7]

DEALERS BY STATE (USA)

| | | | |
|---|---|---|---|
| Alabama | Illinois | Montana | South Carolina |
| Alaska | Indiana | Nebraska | South Dakota |
| Arizona | Iowa | Nevada | Tennessee |
| Arkansas | Kansas | New Hampshire | Texas |
| California | Kentucky | New Jersey | Utah |
| Colorado | Louisiana | New Mexico | Vermont |
| Connecticut | Maine | North Carolina | Virginia |
| New York | Maryland | North Dakota | Washington |
| Delaware | Massachusetts | Ohio | West Virginia |
| Florida | Michigan | Oklahoma | Wisconsin |
| Georgia | Minnesota | Oregon | Wyoming |
| Hawaii | Mississippi | Pennsylvania | |
| Idaho | Missouri | Rhode Island | |

[5] https://www.cpsc.gov/Recalls/2026/Watkins-Manufacturing-Recalls-Hydromassage-Rotary-Jets-in-Highlife-Collection-Spas-Due-to-Entanglement-and-Drowning-Hazards (last accessed March 6, 2026).

[6] *Id.*

[7] https://www.hotspring.com/hot-tub-dealers (last accessed April 9, 2026).

32. Consumer reviews on Defendants' website indicate that consumers purchased these Products from numerous states throughout the country. Below is a review from a consumer, and putative Class Member, who purchased the Grandee model of the Products in a state other than California.[8]

**No service after the sale**

Cathy

**11 months ago**

We are very unhappy with our tub. We could not try rhem as they were going off to a show and had drained them for transport. OK our fault. We were 2 couples we both bought that day. Ours was too deep they said they would mail some type of pillow: didn't happen. At installation they put rib in backwards to steps river etc. said they would fix for $700; did not happen. Installers sis not know how to level even though we're were promised leveling husband had to get them shims and show them how. So far it's been awful we have a hot tub I drown in. Covers up the river view and the steps are on the wrong side. But our friends don't even have theirs yet 2 months later. We all paid cash would never buy from hot springs jacksonville ?orange park? Florida again. No service after the sale.

Helpful? (1) (0) **Report**

Comfort: 1.0

Quality: 4.0

Ease of Water Care: 4.0

Energy Efficiency: 5.0

Value: 1.0

Response from HotSpring: **11 months ago**

Customer Care

I truly apologize for the frustrating experience you've had. It's so important to us that all our customers feel excited about their new spa and can fully relax in it. I'm genuinely sorry that this hasn't been your experience.

I want to assure you that I will be reaching out to your dealer to determine how we can best support you with your spa setup. I share your concern about the shimmed Grandee spa, as we advise that a spa of that size should not be shimmed. Ensuring that the base foundation is level before placing the spa is crucial for optimal enjoyment.

I can also understand how challenging it can be to enjoy your spa when the water level feels too high. A spa seat cushion sounds like a wonderful

[8] https://www.hotspring.com/shop/highlife/grandee (last accessed April 9, 2026).

33. Here is another review from regarding the one of the Products, specifically the Envoy model, from a customer and putative class member who purchased the Product in Tennessee:[9]



This has been a very frustrating experience.

Steven

11 months ago

The hot tub was delivered yesterday by Hot Tubs of Tennessee. I took a water sample in this morning for testing and got instructions on filling and adding chemicals. I was unable to fill the tub with the filter compartment in the gray stand-pipe. I contacted the dealer and after many conversations, they instructed me to "fill the spa with your hose in the bottom of the big area, Leet the water fill to cover all of the jets, Flip on your 30 amp breaker only." I did that, and nothing happened i heard a slight hum for a few seconds, and after several minutes, fearing it would damage the spa, I turned off the 30 amp breaker.. Later this evening, they told me "You're welcome to turn both breakers on. Let me know if you have any issues running your jet pumps or if you spa isn't headed by the morning." This seems contrary to other instructions in the start up guide. I've told them to send a factory tech tomorrow to figure out why the gray stand-pipe won't accept water.

Helpful? (1) (0) Report

Comfort: 5.0

Quality: 1.0

Response from Customer Service Hot Spring Vanessa: 11 months ago

Customer Service Hot Spring Vanessa

I completely understand your frustration. It's disappointing when all you want to do is enjoy your new spa, and you're facing difficulties with filling it. It's curious that the spa couldn't be filled through the gray standpipe. Please keep an eye out for my email—I genuinely want to learn more about this issue and see how I can assist you.

34. Similar reviews can be found on Defendants' website evincing purchasers from states around the country on all models of the Products.

35. The Products were also sold with various accessories, including thermal locking covers, cover lifters, ozone purification systems, water care kits, and steps, which were marketed as integral to the spa ownership experience.

## II. Defendants' Make Marketing and Safety Representations Regarding the Products.

36. Through highly sophisticated marketing and advertising, Defendants consistently implied to consumers that the Products were safe, reliable, and of the highest quality.

[9] https://www.hotspring.com/shop/highlife/envoy (last accessed April 9, 2026).

37. Defendants marketed their Hot Spring brand as a premium wellness product line backed by extensive warranties and quality assurance.

38. Defendants' warranty materials specifically warranted that the jets, including the Moto-Massage® jets and other Hot Spring spa components, were "free from defects in materials and workmanship" for five years.

39. Defendants provided consumers with comprehensive warranty documentation, including a seven-year shell surface warranty, five-year no-leak plumbing warranty, five-year component warranty covering the jets, five-year No-Fault® heater warranty, and five-year cabinet warranty.

40. These extensive warranty representations communicated to consumers that Defendants stood behind the safety and reliability of their Products.

41. Defendants promoted the Hot Spring brand with the tagline "Every day made better®,"[10] reinforcing the message that the Products would enhance consumers' daily lives and well-being.

42. Defendants specifically marketed the hydromassage jet features as providing therapeutic benefits and superior relaxation experiences, without disclosing the entanglement and drowning hazards posed by these jets.

43. Defendants' marketing materials, labeling, and packaging did not contain any warnings about the risk of hair entanglement or drowning hazards associated with the hydromassage rotary jets.

## III. The Products Command Premium Pricing.

44. Defendants commanded premium prices for the Products, ranging from $16,000 to $24,000 for complete spa systems, based on their representations of superior quality, safety, and reliability. This range is far more than the average price of most spa systems.

[10] https://www.hotspring.com/ (last accessed March 6, 2026).

45. Consumers who purchased the Products, including Plaintiff Strong and consumers living outside of California, paid these premium prices with the reasonable expectation that the Products were safe for their intended use and free from life-threatening defects.

46. Defendants' extensive warranty coverage, including the five-year warranty on jets and components, created consumer expectations that the Products had been thoroughly tested and were safe for use by all family members.

47. The Products were marketed for residential home use, with the expectation that consumers would use them regularly for relaxation, hydrotherapy, and wellness purposes.

48. Consumers reasonably expected that premium-priced spa systems marketed by an established brand with comprehensive warranties would not pose entanglement and drowning hazards to users.

49. Defendants' marketing positioned the Highlife Collection as products that would provide "every day made better" experiences, not products that posed serious safety risks requiring immediate cessation of use and emergency repairs.

**IV. Defendants Position Themselves as Spa Safety and Quality Experts.**

50. Defendants marketed themselves as industry leaders and experts in spa manufacturing, safety, and quality, emphasizing their decades of experience in producing premium spa systems.

51. Through their warranty materials and marketing, Defendants represented that they had thoroughly tested and validated the safety of their Products, including the hydromassage jet systems, which were covered by comprehensive five-year warranties against defects in materials and workmanship.

52. Defendants leveraged this reputation as safety and quality experts to justify and command premium prices significantly higher than competitors.

53. In fact, consumers paid between $16,000 and $24,000 for complete spa systems based on the perceived superior safety, quality, and reliability of the products.

54. Consumers, including Plaintiff Strong, reasonably relied on Defendants' expertise when making their purchasing decisions.

55. Consumers were expecting that a premium-priced spa system from an established manufacturer would be thoroughly tested and safe for use by all family members without risk of hair entanglement or drowning hazards.

## V. The Products Suffer from The Defect which Presents a Serious Safety Hazard.

56. Contrary to reasonable consumers' expectations, the Highlife Collection spas suffer from a dangerous defect in materials, workmanship, and/or design in the Hydromassage Rotary Jets.

57. Specifically, the hydromassage rotary jets create a suction force that allows users' hair to become entangled in the jets, submerging their heads underwater and posing serious entanglement and drowning hazards ("the Defect").

58. The Defect exists in every recalled Highlife Collection spa manufactured and sold between October 2022 and September 2025, affecting all eight models: Grandee, Envoy, Vanguard, Aria, Prodigy, Sovereign, Jetsetter, and Jetsetter LX from model years 2023, 2024, and 2025.[11]

59. The Defect presents an unreasonably dangerous condition to consumers during normal and intended use of the Products, which is inconsistent with reasonable consumer expectations and contrary to Defendants' safety representations and marketing.

---

[11] https://www.cpsc.gov/Recalls/2026/Watkins-Manufacturing-Recalls-Hydromassage-Rotary-Jets-in-Highlife-Collection-Spas-Due-to-Entanglement-and-Drowning-Hazards (last accessed March 6, 2026).

60. The U.S. Consumer Product Safety Commission reported at least one confirmed incident of a consumer whose hair became entangled in the defective jets, with the potential for additional unreported incidents.

61. All purchasers have been instructed to "immediately stop using the recalled jets," which is the primary function of the products.

62. Spa jets designed for residential use should incorporate appropriate safety mechanisms to prevent hair entanglement and ensure that suction forces do not pose drowning hazards to users during normal operation.

63. As a result of the Defect, which existed at the point of manufacture and sale but was unknown to reasonable consumers upon purchase, the Products were unsafe and unsuitable for their intended purpose of providing safe hydrotherapy and relaxation.

64. The Defect was latent and not discoverable through reasonable inspection by consumers at the time of purchase, as the dangerous suction force and entanglement hazard were not visible or apparent during ordinary examination of the spa or its jets.

**VI. Defendants' Knew of the Defect and Concealed It.**

65. As the designers, manufacturers, importers, and distributors of the Products, Defendants possessed exclusive and superior knowledge of the Defect that ordinary consumers did not and could not possess.

66. Defendants knew or should have known of the Defect through their design, engineering, testing, and manufacturing processes for the Highlife Collection spas, which were manufactured in China and imported into the United States under Defendants' direction and control.

67. As sophisticated manufacturers in the spa industry with decades of experience, Defendants were intimately familiar with industry safety standards, consumer expectations for safe spa products, and the risks associated with suction forces and entanglement hazards in hydromassage jet systems.

68. Defendants received at least one report of an actual incident in which a consumer's hair became entangled in the defective jets, as confirmed by the CPSC recall announcement, putting Defendants on direct notice of the life-threatening nature of the Defect.[12]

69. This reported incident demonstrated that the Defect was not theoretical but posed real and immediate dangers of entanglement and drowning to consumers using the Products as intended.

70. Moreover, based on several prior recalls, one going back as far as 1982, it was known in the industry that hair entanglement is a hazard that can result from jets that have a defect in materials, workmanship and/or design. Just two years before the subject products first came on the market, a 12-year-old child drowned in a spa pool after her hair was entangled in a jet suction outlet.

71. Despite receiving at least one incident report, Defendants continued to manufacture, import, market, distribute, and sell the Products without disclosing the entanglement and drowning hazards to consumers.

72. From October 2022 through September 2025—a period of approximately three years—Defendants sold approximately 32,900 units of the defective Products in the United States while knowing or having reason to know of the Defect.[13]

73. Throughout this period, Defendants' labeling, packaging, and marketing materials contained no warnings or disclosures about the risk of hair entanglement or drowning hazards associated with the hydromassage rotary jets.

74. Defendants' comprehensive warranty materials, which covered the jets under a five-year warranty against defects in materials and workmanship, contained

---

[12] https://www.cpsc.gov/Recalls/2026/Watkins-Manufacturing-Recalls-Hydromassage-Rotary-Jets-in-Highlife-Collection-Spas-Due-to-Entanglement-and-Drowning-Hazards (last accessed March 6, 2026).

[13] *Id.*

no warnings about entanglement or drowning hazards, despite Defendants' knowledge of these risks.

75. Defendants' instruction manuals and owner's manuals, which was not made available to Plaintiff Strong at the point of sale, contain only a generic warning to "[k]eep any loose articles of clothing, long hair, or hanging jewelry away from rotating jets or other moving components."[14]

76. At the point of sale, Defendants provided no warnings or disclosures to authorized dealers or consumers regarding the Defect, allowing retailers to sell the Products to unsuspecting families without knowledge of the serious safety risks.

77. Defendants possessed exclusive knowledge of material facts regarding the Defect that consumers, including Plaintiff Strong, did not possess and could not have discovered through reasonable inspection or inquiry.

78. The dangerous suction force and entanglement hazard were latent defects not visible or apparent to consumers during ordinary examination, use, or inspection of the Products.

79. Consumers had no access to Defendants' internal design documents, testing data, customer complaint records, materials information, or incident reports that would have revealed the Defect.

80. Consumers, including Plaintiff Strong, reasonably relied on Defendants' silence regarding safety issues, interpreting the lack of warnings, combined with premium pricing and comprehensive warranty coverage, as confirmation that the Products were safe for their intended use.

81. As manufacturers and industry experts, Defendants owed consumers a duty to disclose the material fact that the hydromassage rotary jets posed entanglement and drowning hazards, particularly given the life-threatening nature of the Defect and Defendants' exclusive knowledge of it.

---

[14] https://d1oxc6ayqrhsgs.cloudfront.net/hot-spring/highlife-owners-manual-en_us.pdf (last accessed March 6, 2026).

82. Defendants' concealment of the Defect was intentional and designed to continue sales of the premium-priced Products without the reputational and financial consequences that would result from disclosing the serious safety hazards to consumers.

At the time Defendants sold the Products to Plaintiff Strong and other Class Members, Defendants knew or should have known (or were willfully blind to the fact) that they were selling defective products that failed to conform to their express warranties of being free from defects in materials and workmanship and fit for their intended purpose.

**VII. Defendants Initiate a Belated and Inadequate Recall.**

83. On February 12, 2026, Defendants initiated the Recall in conjunction with the U.S. Consumer Product Safety Commission in all states throughout the country.[15]

84. The Recall applies to approximately 32,900 Highlife Collection spas sold in the numerous different states within the United States between October 2022 and September 2025, covering eight models: Grandee, Envoy, Vanguard, Aria, Prodigy, Sovereign, Jetsetter, and Jetsetter LX from model years 2023, 2024, and 2025.[16]

85. Through the Recall, Defendants for the first time publicly admitted what they had known or should have known for years: that the Products contained a dangerous Defect in the hydromassage rotary jets that posed serious entanglement and drowning hazards to users.

86. But far from offering meaningful relief to consumers who paid premium prices of $16,000 to $24,000 for supposedly safe spa systems, Defendants'

---

[15] https://www.cpsc.gov/Recalls/2026/Watkins-Manufacturing-Recalls-Hydromassage-Rotary-Jets-in-Highlife-Collection-Spas-Due-to-Entanglement-and-Drowning-Hazards (last accessed March 6, 2026).

[16] *Id.*

Recall is wholly inadequate, ineffective, and fails to remedy the harm caused to consumers or adequately protect public safety.

87. The remedy offered by the Recall consists solely of free replacement jet inserts (assuming they are available) that consumers must install themselves after waiting an undetermined time to obtain necessary parts, and then following a multi-step process.

88. However, as one Highlife spa owner previously commented:

> *[W]hile Hotspring Highlife spas are high end luxury spas, **they are not the most DIY weekend warrior friendly spas to fix on your own**. So you'll really want that warranty for the first year in case anything goes majorly wrong, and then you'll be working with that dealer for service calls, be sure you trust them to service your spa properly.*
>
> …
>
> *If you're a DIY weekend warrior, I would pass on the Highlife spas. Personally my time is valuable so I'm fine paying a professional to fix my tub when it's broken.*

89. Defendants' policy violates section 1793.2 of the Song-Beverly Consumer Warranty Act, which prohibits manufacturers like Defendants from requiring consumers to perform their own repairs while a product is still under warranty.

90. The policy also violates Defendants' express warranty, which requires "Watkins or its Authorized Service Agent [to] repair any defects covered by [the] warranty."

91. To obtain the inadequate remedy, consumers must: (1) immediately stop using the recalled jets; (2) navigate to Defendants' website at hotspring.com/recalls; (3) locate their spa's serial number on the front of the spa; (4) determine whether their specific unit has the recalled parts; (5) contact Defendants at 888-450-5748 or jetrecall@watkinsmfg.com to obtain instructions; (6) watch a video demonstrating how to turn off the recalled jets; and (7) install the

replacement jet inserts themselves after some undetermined period of time to receive the replacement.[17]

92. This cumbersome, multi-step, and time-consuming process creates significant barriers to consumer participation and is designed to minimize Defendants' recall costs rather than maximize consumer protection.

93. As demonstrated by research prepared for the CPSC, response rates for recalls are significantly reduced when they involve cognitive or task overload and when they do not adequately motivate consumers to participate or provide simple remedies.

94. Further, it is well known that product recalls generally have a low level of participation when consumers are not provided with a full remedy:

> Generally, firms should offer full remedy to achieve high recall effectiveness. While this seems like an obvious suggestion, our data shows that firms do not always follow that suggestion, even when the product and defect are the same. This is particularly puzzling as research also indicates that offering full remedy is the dominant strategy to preserve customer satisfaction after a product recall (Mafael et al., 2022) and protects firm reputation after the recall (Germann et al., 2014).[18]

95. The Recall provides no monetary compensation whatsoever to consumers who paid between $16,000 and $24,000 for premium spa systems that Defendants expressly warranted would be free from defects in materials and workmanship for five years.

96. The free replacement jet inserts do nothing to compensate consumers for the loss in value of their Products, which are now known to contain life-threatening defects that existed from the moment of manufacture and sale.

---

[17] *Id.*

[18] Sascha Raithel, et al., *Product recall effectiveness and consumers' participation in corrective actions*, Journal of the Academy of Marketing Science (Aug. 19, 2023) (online at https://link.springer.com/article/10.1007/s11747-023-00967-x) (last accessed March 6, 2026).

97. The Recall remedy does not provide refunds, credits, or any form of monetary relief to consumers who would not have purchased the Products, or would have paid substantially less, had Defendants disclosed the entanglement and drowning hazards at the time of sale.

98. By offering only replacement parts rather than full refunds or meaningful compensation, the Recall fails to address the economic harm suffered by Class Members who paid premium prices for defective and dangerous Products.

99. Moreover, Plaintiff and Class Members suffered economic harm in the diminution of value caused by the Defect and by the negative publicity caused by the Recall, both of which led to the Products being worth less than what Plaintiff and Class Members had paid at the point of purchase. This also affects the ability for Plaintiff and Class Members to resell the Products on the secondary market.

100. The Recall came far too late, being initiated on February 12, 2026—more than three years after Defendants began selling the defective Products in October 2022 and after approximately 32,900 dangerous spa units had already been purchased, installed in consumers' homes, and used by unsuspecting families.

101. During this three-year period, consumers including Plaintiff Strong and other Class Members used the Products regularly without any knowledge of the life-threatening entanglement and drowning hazards posed by the defective jets.

102. The Recall does nothing to compensate consumers for having unknowingly exposed themselves and their family members to serious safety hazards during this three-year period when Defendants concealed the Defect.

103. The Recall fails to adequately reach all affected consumers, as many purchasers may no longer reside at their original address, may not regularly check Defendants' website, or may be unaware of the Recall entirely.

104. The Recall also provides no remedy for consumers who overpaid for a spa but who no longer own it.

105. The Recall's requirement that consumers locate their spa's serial number and actively determine whether their specific unit is affected creates an additional barrier that will prevent many consumers from learning they own a recalled Product.

106. The Recall does not eliminate the safety hazard or the underlying Defect in the Products' defect in materials, workmanship, and/or design; it merely attempts to mitigate the most obvious manifestation of the Defect through aftermarket modifications that consumers must perform themselves.

107. The Recall leaves consumers who paid $16,000 to $24,000 for premium spa systems with devalued Products that will forever be known as defective units subject to a safety recall for life-threatening entanglement and drowning hazards. Moreover, the Products have diminished value due to the negative publicity related to the Recall, making them less valuable for Plaintiff and the Class Members should they choose to sell the Products on the secondary market.

108. Research on recall effectiveness demonstrates that recalls without full refunds or simple remedies result in significantly lower participation rates, leaving large numbers of dangerous products in consumers' homes.[19]

109. Defendants' decision to offer only replacement parts rather than refunds ensures that participation rates will be suboptimal and that thousands of defective, dangerous spa units will remain in use across the country.

110. The inadequacy of the Recall underscores the need for court-ordered relief, including full monetary compensation, to adequately remedy the harm caused to consumers who purchased the Products based on the perceived safety and quality of Defendants' products.

---

[19] *See* fn 15.

**VIII. Defendants' Breached Their Warranties for the Products.**

111. Defendants expressly and impliedly warrant, via warranty documents, advertisements, marketing materials, and product packaging, that the Highlife Collection spas are fit for the ordinary purpose for which they are sold.

112. Prior to and at the point of sale, Defendants provided consumers with comprehensive written express warranties covering the Products, including: (1) a seven-year warranty that the acrylic shell surface material would not leak and be free from defects in materials and workmanship; (2) a five-year no-leak plumbing warranty covering leaks from wall fittings, jet fittings, internal plumbing, internal glue joints, drains, hoses, and all bonded parts; (3) a five-year component warranty covering electrical components, pumps, jets (including the Moto-Massage® jets), air valves, levers, bezels, and other Hot Spring spa components against defects in materials and workmanship; (4) a five-year No-Fault® heater warranty; (5) a five-year cabinet warranty covering structural integrity and assembly; (6) a two-year light assembly warranty covering underwater and bar top lighting; (7) a one-year ozone kit warranty; and (8) a one-year cover lift warranty.

113. The warranties also state that if there is a defect, then "Watkins or its Authorized Service Agent will repair any defects covered by this warranty." Defendants will not repair the defects at issue here. Instead, the breach the warranty by requiring purchasers to perform the repair themselves.

114. These express warranties formed part of the basis of the bargain between Defendants and consumers, as Defendants prominently featured their comprehensive warranty coverage in marketing materials and at the point of sale to justify premium prices ranging from $16,000 to $24,000.

115. The express warranties specifically warranted that the jets, which are the very components containing the Defect, would be "free from defects in materials and workmanship" for five years.

116. Moreover, Defendants' Highlife Collection spas are covered by the implied warranty of merchantability, which guarantees that a seller who deals in particular goods by their occupation promises that the goods sold are fit for their ordinary purpose for which they are intended to be used.

117. The implied warranty of merchantability arose by operation of law at the time Defendants sold the Products to consumers, warranting that the Products were of merchantable quality, fit for the ordinary purposes for which such goods are used, adequately packaged and labeled, and conformed to the promises made on the packaging and labeling.

118. Defendants clearly intended their warranties to apply directly to consumers, the purchasers and users who depend on Defendants to provide safe, reliable spa products suitable for home use and family enjoyment.

119. Defendants' manifest intent that their warranties apply to Plaintiff and Class Members as third-party beneficiaries is evident from the statements in their warranty documents, which begin on the date of the consumers' purchases and explicitly exclude commercial use, demonstrating that the warranties were designed specifically for residential consumers.

120. However, despite these express and implied warranties, as described herein, the Highlife Collection spas contain a uniform Defect prior to and at the time of purchase, causing them to commonly and consistently fail in their primary purpose of providing safe hydrotherapy and relaxation.

121. Defendants knew or should have known of the Defect and dangers posed by the hydromassage rotary jets in their Highlife Collection spas prior to and at the time of sale of the Products to consumers.

122. Plaintiff and Class Members, on the other hand, had no way of knowing of the Defect or the dangers to themselves and their family members presented by the Highlife Collection spas prior to purchase.

123. There was a substantial disparity between the parties' bargaining power such that Plaintiff and Class Members were unable to derive a substantial benefit from these express and implied warranties.

124. A disparity existed because Defendants were aware that the Highlife Collection spas were defective, while Plaintiff and Class Members had no notice or ability to detect said Defect, and had no reason to believe such a Defect existed due to Defendants' marketing representations regarding safety, quality, and comprehensive warranty coverage.

125. Defendants abused the special relationship they created with consumers through their marketing as industry experts and manufacturers of premium wellness products and through their designing, manufacturing, marketing, and selling the Highlife Collection spas as products specifically safe and suitable for home use and family enjoyment such that consumers had no choice other than to trust Defendants' representations and thus accept the terms of the warranties.

126. Defendants knew Plaintiff and Class Members had no notice or ability to detect the Highlife Collection spas' uniform Defect, and Defendants knew that Plaintiff and Class Members would bear the cost of remedying or replacing the Products or living with devalued and dangerous spa systems.

127. Defendants knew of the Defect at the time of sale, while Plaintiff and Class Members had no ability to discover the Defect at the time of sale because the entanglement and drowning hazards were latent defects not visible or apparent during ordinary examination or inspection.

128. Defendants were in breach of the warranties at the time Plaintiff and Class Members purchased the Highlife Collection spas because they had a defect in materials, workmanship and/or design when they came off the assembly line. Thus, at the time the defective Products were sold to consumers, Defendants were already in violation of their express and implied warranties.

129. Defendants sold the Highlife Collection spas knowing that they were not capable of being repaired or replaced with non-defective spa systems, as evidenced by the inadequate Recall remedy offering only replacement jet inserts rather than full refunds or replacement with safe spa systems.

130. Plaintiff and Class Members would have negotiated better terms in the purchase of the Highlife Collection spas had they been aware of the Defect, including demanding full disclosure of the entanglement and drowning hazards, substantial price reductions, or declining to purchase the Products altogether.

131. Defendants sold the Highlife Collection spas with knowledge of the Defect and of the fact that the Products failed to conform to their express warranties of being free from defects in materials and workmanship and failed to be safe and suitable for the Products' foreseeable and intended purpose of providing safe hydrotherapy and relaxation for home use.

132. The terms of the express and implied warranties unreasonably favor Defendants over Plaintiff and Class Members by limiting remedies to repair or replacement, disclaiming consequential damages, and attempting to disclaim implied warranties, while Defendants retained the benefit of premium prices ranging from $16,000 to $24,000 for Products they knew were defective.

133. In addition, the express warranties failed in their essential purpose in that: (1) the Defect existed at the time the Highlife Collection spas left the manufacturing facility and was inherent in the materials, workmanship and/or design of the hydromassage rotary jets; (2) the limited remedy of repair or replacement fails its essential purpose because the Defect cannot be truly repaired through replacement jet inserts, as the underlying flaw(s) remains; (3) Defendants failed to disclose their knowledge of the Defect at any time prior to the February 12, 2026 Recall; and (4) approximately 32,900 defective spa units were sold to consumers over a three-year period while Defendants concealed the life-threatening entanglement and drowning hazards.

134. The limited warranty remedy of repair or replacement has failed of its essential purpose because consumers paid premium prices for spa systems warranted to be free from defects in materials and workmanship, yet the Products contained a dangerous Defect from the moment of manufacture that posed entanglement and drowning hazards and cannot be fully remedied through aftermarket modifications.

135. At the time Defendants sold the Products, they knew they could not and would not honor the warranties as given because the entanglement and drowning hazards were present in all units as a result of the defect in materials, workmanship, and/or design of the hydromassage rotary jets, making it impossible for Defendants to provide Products that were truly free from defects in materials and workmanship as expressly warranted.

136. Accordingly, recovery by Plaintiff and Class Members is not restricted to the promises in any express or implied warranties, and they seek all monetary remedies that may be allowed under applicable law, including full monetary compensation for the diminished value of the Products, and economic losses suffered.

**TOLLING ALLEGATIONS**

137. Plaintiff and Class Members could not have discovered through the exercise of reasonable diligence that the Highlife Collection spas had a defect in materials, workmanship, and/or design, and posed entanglement and drowning hazards within the time period of any applicable statutes of limitation.

138. The Defect in the hydromassage rotary jets was latent and not visible or apparent to consumers during ordinary examination, use, or inspection of the Products.

139. Neither Plaintiff nor Class Members knew or could have known that the Highlife Collection spas contained the dangerous Defect prior to the Recall announcement on February 12, 2026.

140. Defendants did not disclose the dangerous Defect in the Highlife Collection spas and the entanglement and drowning hazards posed by the defective hydromassage rotary jets throughout the entire sale period from October 2022 through September 2025.

141. Plaintiff and Class Members could not have reasonably discovered and could not have known of facts that would have caused a reasonable person to suspect that Defendants knowingly failed to disclose material safety information within their knowledge about the dangerous Defect to consumers in the United States and elsewhere.

142. Defendants' labeling, packaging, marketing materials, and warranty documents contained no warnings to consumers prior to the point of sale about the risk of hair entanglement or drowning hazards associated with the hydromassage rotary jets, despite Defendants' knowledge of these risks.

143. The Recall announcement on February 12, 2026, was the first time reasonable consumers, including Plaintiff and Class Members, could have known about the Defect and the entanglement and drowning hazards posed by the Products.

144. Plaintiff's causes of action did not accrue until February 12, 2026, when the Recall publicly revealed the existence of the Defect for the first time.

145. This action is being filed on February 25, 2026, shortly after the Recall announcement, demonstrating Plaintiff's diligence in pursuing claims once the Defect became known.

146. As such, no potentially relevant statute of limitations should be applied to bar Plaintiff's or Class Members' claims.

## NO ADEQUATE REMEDY AT LAW

147. Plaintiff and members of the Class are entitled to equitable relief because no adequate remedy at law exists.

148. Legal remedies are inadequate because they are not equally prompt and certain and in other ways efficient as equitable relief.

149. Damages are not equally certain as restitution because the standard that governs restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it determines that Plaintiff fails to sufficiently adduce evidence to support an award of damages.

150. Damages and restitution are not the same amount. Unlike damages, restitution is not limited to the amount of money Defendants wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles a plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize. Plaintiff seeks non-restitutionary disgorgement of profits in connection with his unjust enrichment claim.

151. Legal claims for damages are not equally certain as restitution because equitable claims entail few elements.

152. In short, significant differences in proof and certainty establish that any potential legal claim cannot serve as an adequate remedy at law.

## CLASS ACTION ALLEGATIONS

153. Plaintiff brings this action individually and on behalf of all others similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) on behalf of himself and the members of the following proposed nationwide class ("**Nationwide Class**"):

**During the fullest period allowed by law, all persons who purchased Highlife Collection spas with Hydromassage Rotary Jets (6 fin) in the United States for personal use and not resale.**

154. Plaintiff brings this action individually and as a representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23, on behalf of himself and the members of the following proposed California class ("**California Class**"):

**During the fullest period allowed by law, all persons who purchased Highlife Collection spas with Hydromassage Rotary Jets (6 fin) in the State of California for personal use and not resale.**

155. Finally, Plaintiff brings this action individually and as a representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23, on behalf of himself and the members of the following proposed Multi-State Consumer Protection Class ("**Multi-State Class**"):

**During the fullest period allowed by law, all persons who purchased Highlife Collection spas with Hydromassage Rotary Jets (6 fin) in the states of California, Illinois, Massachusetts, Minnesota, Missouri, New Jersey, New York, and Washington.**[20]

156. Specifically excluded from these definitions are: (1) Defendants, any entity in which Defendants have a controlling interest, and their legal representatives, officers, directors, employees, assigns and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class Counsel. Plaintiff reserves the right to amend the Class definitions as necessary.

157. The foregoing class definitions are placeholders. Subject to further investigation and pursuant to Rule 23(c)(1)(C), they may be modified any time before final judgment, including through the use of multi-state subclasses to account for material differences in state law, if any.

158. Plaintiff also reserves the right to modify the class definitions, if necessary, to include additional products made by Defendants with the same Defect

[20] Plaintiffs seek to certify a Multi-State Consumer Protection Class consisting of persons in the following states (and implicating the following statutes): California (Cal. Bus. & Prof. Code §§ 17200, *et seq.*); Illinois (815 ICLS §§ 505/1, *et seq.*); Massachusetts (Mass. Gen. Laws Chapter 93A, *et seq.*); Minnesota (Minn. Stat. §§ 325F.67, *et seq.*); Missouri (Mo. Rev. Stat. §§ 407.010, *et seq.*); New Jersey (N.J. Stat. §§ 56:8-1, *et seq.*); New York (N.Y. Gen. Bus. Law §§ 349, *et seq.*); and Washington (Wash. Rev. Code §§ 19.86.010, *et seq.*).

and/or other products manufactured by Defendants with the common Defect but bearing different brand names.

159. Plaintiff seeks only damages and equitable relief on behalf of himself and the putative Classes. Plaintiff disclaims any intent or right to seek any recovery in this action for personal injuries, wrongful death, or emotional distress suffered by Plaintiff and/or putative Class Members.

160. ***Numerosity:*** The Members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class Members is presently unknown, it likely consists of at least tens of thousands of people throughout the United States and thousands of people in the State of California, as approximately 32,900 Highlife Collection spas with the defective hydromassage rotary jets were sold in the United States. The number of Class Members can be determined by sales information and other records. Moreover, joinder of all potential Class Members is not practicable given their numbers and geographic diversity. The Class is readily identifiable from information and records in the possession of Defendants and their authorized dealers and retailers.

161. ***Commonality:*** Common questions of law and fact exist as to all Members of the Class. These questions predominate over questions that may affect only individual Class Members because Defendants have acted on grounds generally applicable to the Class. Such common legal or factual questions include, *inter alia*:

a. Whether the Highlife Collection spas are defective;

b. Whether the Highlife Collection spas have a defect in materials, workmanship, and/or design;

c. Whether Plaintiff and the members of the Class have been injured by Defendants' misconduct, and the proper measure of their losses as a result of those injuries; and

d. Whether Plaintiff and the members of the Class are entitled to damages, including compensatory, exemplary, and statutory damages, and the amount and nature of such damages;

162. ***Typicality:*** The claims of the representative Plaintiff are typical in that Plaintiff, like all Class Members, purchased a Highlife Collection spa that was manufactured, marketed, advertised, distributed, and sold by Defendants. Plaintiff, like all Class Members, was damaged by Defendants' uniform misconduct in that, *inter alia*, he has incurred or will continue to incur damage as a result of overpaying for the Highlife Collection spa that was manufactured with the Defect, which makes the Highlife Collection spas unsafe, inherently dangerous, and not fit for their intended use, and which is subject to an inadequate Recall. Furthermore, the factual basis of Defendants' misconduct is common to all Class Members because they engaged in systematic fraudulent behavior that was deliberate, includes negligent misconduct, and results in the same injury to all Class Members. Plaintiff is advancing the same claims and legal theories on behalf of himself and all members of the Classes he seeks to represent.

163. ***Adequacy:*** Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no conflicts of interest with other Class Members. The interests of the Class can be and will be fairly and adequately protected by Plaintiff and his counsel.

164. ***Predominance and Superiority Under Rule 23(b)(3):*** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Class would be impracticable. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudications of the asserted claims, and there will be no difficulty in the management of this action as

a class action. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for members of the Class to individually seek redress for Defendants' wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

165. Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of himself and other Class Members. Similar or identical statutory violations, common law wrongs, business practices, and injuries are involved. Individual questions, if there are any, pale by comparison, in both quality and quantity, to the numerous common questions that predominate in this action

## COUNT I

**California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq.**

**(*On Behalf of Plaintiff and the California Class*)**

166. Plaintiff adopts and incorporates by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

167. This Count is brought on behalf of Plaintiff and the California Class ("Class" for the purposes of this Count) against Defendants.

168. California Business & Professions Code Section 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

169. Defendants acted with knowledge and intent.

170. Plaintiff alleges a claim under the unfair and unlawful prongs of the UCL. Plaintiff does not allege a claim under the fraud prong at this time, but reserves his right to do so later in these proceedings.

171. Defendants' conduct constitutes "unfair" business acts and practices within the meaning of the UCL, in that its conduct was injurious to consumers, offended public policy, and was unethical and unscrupulous.

172. Both Defendants' conduct was unfair because they manufactured and distributed hazardous products, refuse to give refunds for those products, and do not comply with the repair requirements under the Song-Beverly Consumer Warranty Act or the written warranty for the products.

173. Defendants' conduct also was unfair because even though a CPSC recall "has no legally binding effect" and does not preempt any cause of action under state law (*see*, *e.g.*, 16 C.F.R. § 1115.20), Defendant has exploited the CPSC recall as an excuse to breach its product warranty and to violate state laws.

174. Consistent with the previous allegation, if Defendants seek dismissal of this matter based on the CPSC recall, that will furnish further evidence of their intent to exploit the recall for improper purposes.

175. Plaintiff also alleges a violation under the "unlawful" prong of the UCL because Defendants' conduct violated consumer protection laws and the common law as set forth here.

176. Defendants also violated 16 C.F.R. 1115.4 and 1115.6, which requires every manufacturer and importer, distributor, and retailer of a consumer product to inform the CPSC when they obtain information which reasonably supports the conclusion that the product contains a defect which could create a substantial product hazard, or an unreasonable risk of serious injury.

177. There is no adequate remedy at law for the reasons already alleged above.

178. As a direct and proximate result of Defendants' unfair and deceptive practices, Plaintiff and Class Members have suffered out-of-pocket losses.

179. Plaintiff and Class Members have suffered an injury in fact resulting in the loss of money and/or property as a proximate result of the violations of law and wrongful conduct of Defendants alleged here, and they lack an adequate remedy at law to address the unfair conduct at issue here.

180. Plaintiff seeks all monetary relief available under the UCL. Plaintiff does not seek injunctive relief under the UCL.

## COUNT II

### Violation of Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790, *et seq.*

### (*On Behalf of Plaintiff and the California Class*)

181. Plaintiff adopts and incorporates by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

182. This Count is brought on behalf of Plaintiff and the California Class ("Class" for the purposes of this Count) against Defendants.

183. The Products are "consumer goods" and the Plaintiff and Class Members are "buyers" within the meaning of Cal. Civ. Code § 1791.

184. Defendants are a "manufacturer," "distributor," and/or "retail seller" under Cal. Civ. Code § 1791.

185. The implied warranty of merchantability included with the sale of each Product means that Defendants warranted that each Product (a) would pass without objection in trade under the contract description; (b) was fit for the ordinary purposes for which the Product would be used; and (c) conformed to the promises or affirmations of fact made on the container or label.

186. The Products would not pass without objection in the trade because they contain the above-described Defect, which also makes them unfit for the ordinary purpose for which they would be used.

187. The Products are not adequately labeled because their labeling fails to disclose the Defect and does not advise class members of the existence of the danger prior to experiencing failure firsthand.

188. The Products were not sold on an "as is" or "with all faults" basis.

189. Any purported disclaimer of implied warranties was ineffective because it was not conspicuous and not made available to the purchaser before the sale of the Product. Instead, if a disclaimer was made at all, it was buried in an owner's manual, which was tucked away in the product packaging and not made available until after purchase.

190. Defendants' actions have deprived the Plaintiff and Class Members of the benefit of their bargains and have caused the Products to be worth less than what Plaintiffs and other class members paid.

191. As a direct and proximate result of the breach of implied warranty, Class Members received goods whose condition substantially impairs their value. Class members have been damaged by the diminished value of their Products.

192. Defendant further violated section 1793.2 of the Song-Beverly Consumer Warranty Act, which requires that "every manufacturer of consumer goods sold in [California] and for which the manufacturer has made an express warranty shall" maintain in California service and repair facilities (or authorized independent facilities) close to all areas where its consumer goods are sold to carry out the terms of those warranties. If a warranted product requires repair, there are three options: (1) the buyer can deliver the product to the service facilities for repairs; (2) the manufacturer will come to the buyer's home to make the repair; or (3) the manufacturer will either pick up the product or pay for shipment of the product to the manufacturer. None of those things happened in connection with the defective products at issue here.

193. Under Cal. Civ. Code §§ 1791.1(d) and 1794, the Plaintiff and class members are entitled to damages and other legal and equitable relief, including, at

their election, the right to revoke acceptance of the Products or the overpayment or diminution in value of their Products. They are also entitled to all incidental and consequential damages resulting from the breach, as well as reasonable attorneys' fees and costs.

194. Plaintiff seeks all relief available under this cause of action.

## COUNT III

### Breach of Express Warranty

**(*On Behalf of Plaintiff, the Nationwide Class or, in the Alternative, the California Class*)**

195. Plaintiff adopts and incorporates by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

196. Plaintiff brings this cause of action on behalf of himself and the Nationwide Class or, in the alternative, on behalf of the California Class, for breach of express warranty under the Uniform Commercial Code or, in the alternative, Cal. Com. Code § 2313.

197. Defendants are and were at all relevant times "merchants" with respect to the Highlife Collection spas under UCC § 2-104.

198. Plaintiff and Class members are "buyers" within the meaning of UCC § 2-103.

199. The Highlife Collection spas are and were at all relevant times "goods" within the meaning of UCC § 2-105.

200. In connection with the purchase of the Highlife Collection spas, Defendants provided Plaintiff and Class members with written express warranties, including a seven-year shell surface warranty, a five-year no-leak plumbing warranty, and a five-year component warranty expressly warranting that the jets, including the hydromassage rotary jets, would be "free from defects in materials and workmanship."

201. Further, through their marketing and promotional materials, Defendants expressly warranted and represented that the Highlife Collection spas were safe, properly designed and manufactured, free from defects, and suitable for their intended use of providing safe hydrotherapy and relaxation for home use.

202. Defendants' express warranties and representations formed the basis of the bargain that was reached when Plaintiff and Class members purchased the Highlife Collection spas at premium prices ranging from $16,000 to $24,000.

203. Plaintiff and Class members relied on these express warranties in making their purchasing decisions.

204. Defendants breached the express warranties because the Highlife Collection spas did not conform to the warranties. The Products contained the Defect in the hydromassage rotary jets from the point of manufacture and sale, rendering them unsafe and unsuitable for their intended use.

205. The Defect was present at the time of sale and Defendants knew of the Defect through their design, engineering, and manufacturing processes, and at least one reported incident of hair entanglement.

206. On March 5, 2026, Plaintiff sent Defendants a notice letter notifying them of their breach of express and implied warranties, and all other applicable federal and state laws.

207. Further notice would be futile because Defendants have acknowledged through the Recall that the Products are defective.

208. Privity exists because Plaintiff and Class members are the intended third-party beneficiaries of Defendants' express warranties, which were provided directly to consumers and designed specifically for residential purchasers. Alternatively, privity is not required under applicable law.

209. As a direct and proximate result of Defendants' breach of express warranties, Plaintiff and Class members have been damaged in an amount to be proven at trial.

## COUNT IV

**Breach of Implied Warranty of Merchantability**

**(*On Behalf of Plaintiff, the Nationwide Class or, in the Alternative, the California Class*)**

210. Plaintiff adopts and incorporates by reference the allegations contained in all preceding paragraphs as though fully set forth herein.

211. Plaintiff brings this cause of action on behalf of himself and the Nationwide Class or, in the alternative, on behalf of the California Class, for breach of implied warranty of merchantability under the Uniform Commercial Code or, in the alternative, Cal. Com. Code § 2314, against Defendants.

212. Defendants are and were at all relevant times "merchants" with respect to the Highlife Collection spas under UCC § 2-104 and Cal. Com. Code § 2104.

213. Plaintiff and Class members are "buyers" within the meaning of UCC § 2-103 and Cal. Com. Code § 2103.

214. The Highlife Collection spas are and were at all relevant times "goods" within the meaning of UCC § 2-105 and Cal. Com. Code § 2105.

215. By selling the Highlife Collection spas, Defendants impliedly warranted that the Products were merchantable and fit for the ordinary purposes for which such goods are used—namely, safe use as spa and hot tub products for home hydrotherapy and relaxation.

216. A warranty that the Highlife Collection spas were in merchantable condition was implied by law in the transactions through which Plaintiff and Class members purchased the Products. The implied warranty of merchantability arises by operation of law when a merchant sells goods to consumers.

217. To be merchantable, premium spa products sold for $16,000 to $24,000 and marketed for home use must be safe for users and free from defects that create unreasonable safety hazards, including entanglement and drowning hazards.

218. To be merchantable, spa products must provide a safe hydrotherapy and relaxation experience when used in their expected manner, without posing life-threatening risks to users during normal operation.

219. Defendants breached the implied warranty of merchantability because the Highlife Collection spas are not merchantable. The Products contain the Defect in the hydromassage rotary jets, which renders them unsafe and unsuitable for their intended use.

220. The Highlife Collection spas create unreasonable safety hazards to consumers during normal and intended use. Specifically, the hydromassage rotary jets create a dangerous suction force that allows users' hair to become entangled, submerging their heads underwater and posing serious entanglement and drowning hazards.

221. The Products are not fit for the ordinary purpose of safe spa use because they expose users to the risk of hair entanglement and drowning during normal operation, which is contrary to the fundamental purpose of safe home hydrotherapy and relaxation for which consumers purchase spa systems.

222. The Defect existed at the time of sale in all Highlife Collection spas manufactured and sold between October 2022 and September 2025, affecting all eight models from model years 2023, 2024, and 2025.

223. The Defect was inherent in the materials, workmanship, and/or design of the hydromassage rotary jets and was present in each unit when it left Defendants' control and reached consumers through authorized dealers and retailers.

224. Defendants knew or had reason to know of the Defect and that the Products were not merchantable prior to and throughout the period they sold the Products to consumers.

225. Defendants' knowledge is evidenced by their receipt at least one report of an actual incident in which a consumer's hair became entangled in the jets and

their exclusive knowledge through design, engineering, testing, and manufacturing processes.

226. Despite this knowledge, Defendants continued to manufacture, market, and sell approximately 32,900 defective spa units between October 2022 and September 2025 without disclosing the entanglement and drowning hazards to consumers.

227. These warranty disclaimers are unconscionable and ineffective given Defendants' knowledge of the Defect and the serious safety hazards involved. The disclaimers are unconscionable because they were presented to consumers on a take-it-or-leave-it basis, were hidden in lengthy warranty documents received only after purchase, and unreasonably favor Defendants by attempting to disclaim liability for life-threatening defects while Defendants retained the benefit of premium prices ranging from $16,000 to $24,000.

228. The warranty limitations fail their essential purpose because consumers paid premium prices for spa systems expressly warranted to be merchantable and fit for their ordinary purpose, yet the Products contained a dangerous Defect from the moment of manufacture that posed entanglement and drowning hazards and cannot be fully remedied through aftermarket modifications.

229. Plaintiff and Class members are the intended third-party beneficiaries of the implied warranty of merchantability. Defendants' manifest intent that their warranties apply to consumers is evident from their marketing of the Products for residential home use and their exclusion of commercial use from warranty coverage.

230. Plaintiff and class members purchased the product from an authorized dealer who was an agent of the Defendants. Plaintiff was the intended consumer of the product, not the authorized dealer. The Defendants' warranty was intended to benefit the consumer, not the authorized dealer.

231. The Defendants were aware of remote customers' requirements that products work safely and was aware that remote customers generally expected the product to meet minimum standards.

232. Alternatively, privity is not required under applicable law because the Defect poses unreasonable safety hazards to consumers and the general public.

233. On March 5, 2026, Plaintiff sent Defendants a notice letter notifying them of their violations of the CLRA, breach of express and implied warranties, and all other applicable federal and state laws.

234. Additionally, Defendants were provided notice of the breach through the Recall announcement on February 12, 2026and the reported incident of hair entanglement.

235. Further notice would be futile because Defendants have acknowledged through the Recall that the Products are defective and pose entanglement and drowning hazards.

236. As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and Class members have been damaged in an amount to be proven at trial.

237. Plaintiff and Class members would not have purchased the Highlife Collection spas, or would have paid significantly less for them, had they known the Products were not merchantable and posed entanglement and drowning hazards.

**COUNT V**

**Unjust Enrichment**

**(*On Behalf of Plaintiff, the Nationwide Class or, in the Alternative, the California Class*)**

238. Plaintiff adopts and incorporates by reference the allegations contain in all preceding paragraphs as though fully set forth herein.

239. Plaintiff brings this cause of action on behalf of himself and the Nationwide Class or, in the alternative, on behalf of the California Class.

240. To the extent required, Plaintiff asserts this cause of action in the alternative to legal claims, as permitted by Fed. R. Civ. P. 8.

241. Plaintiff and Class Members conferred a benefit on Defendants in the form of the gross revenues Defendants derived from the money consumers paid to purchase the Products.

242. Defendants knew of the benefit conferred on it by Plaintiff and the Class Members.

243. Defendants has been unjustly enriched in retaining the revenues derived from Plaintiff's and the Class Members' purchases of the Products, which retention is under these circumstances unjust and inequitable because Defendants omitted disclosing that the Products were dangerous. This conduct caused injuries to Plaintiff and class members because they would not have purchased the Products or would have paid less for them if the true facts concerning the Products had been known.

244. Defendants accepted and retained the benefit in the amount of the gross revenues it derived from sales of the Products.

245. Defendants have profited by retaining the benefit under circumstances which would make it unjust for Defendants to retain the benefit.

246. Plaintiffs and the class members are, therefore, entitled to restitution in the form of the revenues derived from Defendants' sale of the Products.

247. As a direct and proximate result of Defendants' actions, Plaintiff and Class Members have suffered in an amount to be proven at trial.

248. Class Members have suffered an injury in fact and have lost money as a result of Defendants' unjust conduct.

249. Class Members lack an adequate remedy at law with respect to this claim and are entitled to non-restitutionary disgorgement of the financial profits that Defendants obtained as a result of its unjust conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the proposed Classes, respectfully requests that this Court:

A. Certify this case as a class action on behalf of the Nationwide Class, and/or California Class as defined herein, appoint Plaintiff as Class Representative, and appoint Plaintiff's counsel as Class Counsel;

B. Enter judgment in favor of Plaintiff and the Classes on all Counts alleged herein;

C. Award compensatory damages in an amount to be proven at trial;

D. Award punitive damages as authorized by law;

E. Award restitution, disgorgement, and all other equitable relief, including rescission;

F. Award declaratory relief clarifying the rights and obligations of the parties;

G. Award pre-judgment and post-judgment interest, as allowed by law;

H. Award reasonable attorneys' fees and costs as authorized by law; and

I. Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated: April 13, 2026

Respectfully submitted,

/s/ Yeremey Krivoshey

**SMITH KRIVOSHEY, PC**
Yeremey O. Krivoshey (State Bar No. 295032)
28 Geary Street, Suite 650 # 1507
San Francisco, CA 94108
Phone: 415-839-7000
E-Mail: yeremey@skclassactions.com

**SMITH KRIVOSHEY, PC**
Joel D. Smith (State Bar No. 244902)
867 Boylston Street, 5th Floor, Ste. 1520
Boston, MA 02116
Phone: 617-377-7404
E-Mail: joel@skclassactions.com

**FELDMAN SHEPHERD WOHLGELERNTER TANER WEINSTOCK DODIG LLP**
Zachary Arbitman*
George Donnelly*
Nicole Maruzzi*
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103
T: (215) 567-8300
F: (215) 567-8333
zarbitman@feldmanshepherd.com
gdonnelly@feldmanshepherd.com
nmaruzzi@feldmanshepherd.com

*(pro hac vice forthcoming)

*Attorneys for Plaintiff*